KOMA Incorporated v. Commissioner. Tulsa Broadcasting Company v. Commissioner.
KOMA v. Commissioner
Docket Nos. 16580, 16581.
United States Tax Court
1949 Tax Ct. Memo LEXIS 14; 8 T.C.M. (CCH) 1064; T.C.M. (RIA) 49284; December 14, 1949
*14 L. Karlton Mosteller, Esq., First National Bldg., Oklahoma City, Okla., for the petitioners. E. G. Sievers, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated for hearing and involve deficiencies in income taxes, as follows: KOMA, Inc.*2*Tulsa Broadcasting Co.
1943
1944
1943
1944
Income tax
$ 973.68
$2,228.06
$9,334.29
$6,853.50
Excess-profits tax
9,707.55
9,222.17
1,301.81 The common issue is whether petitioners are subject to the surtax imposed by section 102 of the Internal Revenue Code. Other issues raised by the pleadings have been abandoned. Respondent conceded at the hearing that KOMA, Inc., was entitled to a credit in 1943 for dividends paid to stockholders in the amount of $3,000. The concession will be reflected in recomputations under Rule 50. The returns of the petitioners were filed with the collector for the district of Oklahoma. Findings of Fact KOMA, Incorporated, the petitioner in Docket No. 16580, hereinafter referred to as Koma, was organized on October 31, 1938, under the laws of Oklahoma. The other petitioner, Tulsa Broadcasting Company, hereinafter referred to as Tulsa, was organized in November 1933 *15 under the laws of Delaware. The petitioners are in the broadcasting business. Koma owns and operates station KOMA, in Oklahoma City, Oklahoma, and Tulsa owns and operates station KTUL, in Tulsa, Oklahoma. The operation of each station has been financially successful. Koma was the sole outlet for the Columbia Broadcasting Company in Oklahoma City. At the close of the years 1943 to 1948, inclusive, the shares of stock outstanding of the petitioners were owned, as follows: Koma
Tulsa
Common
Preferred
Common
J. T. Griffin [1]
50
2,015
254 [2]
Estate of J. T. Griffin [3]
50
2,015
254 [2]
John Toole Griffin [4]
144
20
96 [5]
Marjory G. Leake [6]
100
45
87 [7]
Adele Griffin Rea
150
Tulsa
100 [8] *16 Bryan Cole
3 [9]
Bryan Mathes
3 [10]
R. L. Griffin [11]
33
J. C. Leake
16 [12] The perferred stock of Koma had equal voting rights with common stock. The stockholders of Koma and Tulsa controlled the Ogden Trust Co., Griffin Grocery Co. of Arkansas, Griffin Grocery Co., Griffin Investment Co., and Griffin-Goodner Grocery Co. J. T. Griffin owned about 56 per centum of the stock of the Griffin Grocery Co. and his son and daughter all except 11 of the remaining shares in substantially equal amounts. Prior to March 1941 Koma was operating AM (standard) facilities on 1,480 kilocycles with 5 kilowatts of power. In January 1940 it applied to the Federal Communications Commission, hereinafter referred to as the FCC, for permission to increase the power to 50 kilowatts on the same frequency. In March 1940 the application was amended to change 690 kilocycles. In March 1941 the FCC authorized Koma to operate on 1,520 kilocycles with a non-directional *17 antenna and the same power. Koma filed applications later in that year to operate on 690 kilocycles with 50 kilowatts of power during the day and 25 at night, using a directional antenna. In December of that year Koma amended its application by requesting a reduction of operating power to 10 kilowatts day and night. In April 1942 the FCC issued an order to the effect that it would deny future applications involving the use of material to construct or change facilities of any standard, television or high frequency (FM) broadcasting station. Provision was made in the order for prosecution of pending applications, failing to do so by June 1, 1942, to be regarded as an abandonment of the application. The order was not rescinded until August 1945. The frequency of 1,520 kilocycles being used by Koma was producing interference with two other stations, concerning which a complaint had been made. In February 1944 the FCC authorized Koma to amend its pending application to request a change of the frequency of its AM station from 1,520 to 690 kilocycles, with a non-directional antenna, and its power to 5 kilowatts during the day and one-half kilowatt at night. Such a change did not involve *18 any new equipment and could have been made at practically no cost. In November 1945 the FCC granted an application, filed October 4, 1945, to increase the power to 50 kilowatts on 1,520 kilocycles, with directional antenna, and since January 1947 Koma has been operating on that power and frequency. The application was designed to avoid interference with other stations. The change was made in the AM facilities at a cost of $186,030.37 in 1946 and $31,061.23 in 1947, a total of $217,091.60. The original estimate for the change was about $177,000. In 1940 the FCC first made allocations of electrical power for commercial use of frequent modulation (FM) and experimental operation of television (TV). Television was in its experimental stages in 1943 and 1944. The art of television broadcasting remained practically stationary during the last war. At various times prior to and during the taxable years Bryan Mathes and Bryan Cole discussed with the chief engineers and general managers of petitioners the question of whether the corporations should eventually extend their facilities to include operation with FM and TV. The chief engineer of Tulsa estimated in 1942 that the cost of facilities *19 for broadcasting on FM and with TV would be from $250,000 to $500,000. In 1940 the chief engineer of Koma guessed that the facilities for FM would cost from $160,000 to $200,000 and TV about $250,000. In 1943 and 1944 the manager of Koma estimated that the cost for FM and TV would be a total of from $300,000 to $400,000 or more. One of the estimates made by directors of Tulsa was that the loss from operating FM and TV would be $80,000 a year for from three to five years. No formal action was taken by the board of directors of either corporation prior to or during the taxable years to engage in FM or TV operations. In July 1945 Koma, pursuant to authority granted by its directors on April 3, 1945, first applied to the FCC for permission to construct and operate an FM station, and applied for use of 50 kilowatts of power, at an estimated installation cost of $112,060. It was estimated in the application that operation costs would be $6,000 a month at the outset and $10,000 a month under normal conditions, and that the income would be $15,000 a month at the end of three years. A final permit to operate FM was granted in July 1946. Under an option granted by the FCC in 1947, Koma acquired, *20 at a cost of $17,845.71, a one kilowatt transmitter for operation until a 50 kilowatt transmitter became available, and started to broadcast with it in March 1948. Other cost in 1947 for FM was $816.26. Delivery of a 50 kilowatt transmitter was not expected until January 1, 1949. In July 1948 Koma, in accordance with a resolution passed by its directors on July 2, 1948, applied to the FCC for permission to operate a commercial TV station. No action had, at time of trial, been taken by FCC under the application. It was estimated in the application that the cost of necessary equipment would be $238,925, and that the operating losses the first year would be $35,000. No TV equipment was available until 1948. Coaxial cable, used to convey television programs, will not be available until 1950. The financial success of the operation of FM and TV radio stations is dependent upon the number of receiving sets available to the listening public. New equipment is necessary from a practical standpoint to receive FM broadcasting. Petitioners did not know at any time the number of receiving sets available to receive FM or TV signals. The surplus of Koma increased from $30,000 at the close of 1938, *21 to $130,270 at the close of 1942, and it had earnings during each of such years. Its assets, current liabilities, capital stock and surplus, omitting cents, at the close of the years 1943 to 1947, inclusive, and net earnings each year, were, as follows: 1943
1944
1945
1946
1947
Assets: Current
$196,325
$319,009
$306,166
$121,837
$ 79,027
Other
295,541
303,262
302,310
501,226
458,382
Current Liabilities
65,484
148,868
102,295
60,591
149,609
Capital Stock: Common
30,000
30,000
30,000
30,000
30,000
Preferred
258,000
258,000
248,000
223,000
Surplus
163,382
210,404
253,181
309,472
357,800
Net earnings
36,382
48,263
42,777
56,290
48,328 The notes receivable in current assets for 1943, 1944 and 1945, consisted of notes, payable on demand, from the Griffin Grocery Company in the amounts of $30,000, $65,000 and $50,000, respectively, to evidence loans. The note outstanding at the close of 1943, interest 1 1/2 per centum, was a renewal of demand loans made in 1941 and 1942 at 2 per centum interest. The notes outstanding at the close of 1944 consisted of such note and a new demand loan made on July 26, 1944, in the amount of $35,000, at 1 1/2 per centum interest. Each note was paid on June 26, 1945. The note for $50,000, outstanding at *22 the close of 1945, represents a loan made on July 12, 1945, with interest at the rate of 1 1/4 per centum and was paid in 1946. Other demand loans, interest 2 per cent, were made by Koma in the years 1939 to 1942, inclusive, to the same corporation and other companies controlled by the stockholders of Koma and were paid prior to or in 1943. The current liabilities at the close of 1947 include a note for $100,000 held by a bank. Koma paid dividends on its preferred and common stock during the years 1939 to 1943, inclusive, as follows: Preferred
Common
1939
$14,718
1940
16,200
1941
12,150
$3,000
1942
7,500
1943
3,000 No dividends were paid from 1944 to 1947, inclusive. The preferred stock had a par value of $100 a share, was callable at the option of the corporation and entitled to 6 per cent cumulative dividends, secured by a first lien on the corporation's assets. It was retired in 1947 without payment of the accumulated dividends. To obtain funds with which to redeem the stock, Koma borrowed $130,000 from a bank at 2 1/2 per cent interest. One reason for retiring the stock was to provide funds for the estate of John T. Griffin. In December 1946, or the early part of 1947, Koma sold the new site *23 and building for its AM station to the Griffin Investment Co. for about $75,000 and promptly rented the property from the buyer for $400 a month. Tulsa, since 1940, has operated AM on 5 kilowatts, directionalized at night, and 1,420 kilocycles, the maximum of its facilities. An increase in power on that frequency is not possible and it was not aware of any other changes that could be made to improve its AM service to the public. Its principal competitor operates on 50 kilowatts with a clear channel. In 1941 Tulsa conducted experimental operations in FM broadcasting by merely building an FM receiver and a modulator. On April 3, 1945, the directors of Tulsa, by resolution, authorized its officers to apply to the FCC for permission to operate an FM station. The application was filed thereafter in 1945 and granted in 1946 to operate with 170 kilowatts of power. It was estimated in the application that the cost of the facilities would be from $106,600 to $118,600; that the monthly cost of operation would be $5,000 and that the revenue at the end of three years would be $12,000 a month. Approval of the site selected for broadcasting was withdrawn in 1948 by the FCC and no new site has been *24 selected. Equipment was not available to Tulsa at the time of the hearing for constructing an FM station for operation under the permit. Necessary equipment was expected January 1, 1949. Since April 1948 it has been broadcasting temporarily on FM with a one kilowatt transmitter under an option granted by the FCC. Tulsa may never operate FM with 170 kilowatts of power under the permit granted by the FCC. On June 12, 1948, Tulsa's board of directors resolved to take steps to apply for authority to construct and operate a television station; and, pursuant to such authority, applied to the FCC for permission to operate a TV station, giving $219,915 as the estimated cost for installing necessary equipment and $35,000 as loss to be sustained during the first year of operation. The application is still pending. The minutes of June 12, 1948, recited a statement by James C. Leake that the Board had considered a television station for a long time and that contractors and engineers estimated probable cost as $350,000 or $400,000. Tulsa had earnings each year from 1939 to 1942, inclusive, during which period its surplus increased from about $103,000 to $190,000. Its assets, current liabilities, *25 capital stock and surplus, omitting cents, at the close of the years 1943 to 1947, inclusive, and net earnings each year, were, as follows: 1943
1944
1945
1946
1947
Assets
Current
$280,862
$374,409
$372,642
$418,515
$350,808
Other
56,433
60,515
37,600
46,815
92,498
Current liabilities
69,258
124,779
67,674
57,495
18,342
Capital stock
47,000
47,000
47,000
47,000
47,000
Surplus
221,038
263,144
295,567
360,834
377,964
Net earnings
30,722
39,868
32,957
65,267
17,129 The current assets include notes and accounts receivable from stockholders of Tulsa and companies controlled by them, cents being omitted, as follows: 1943
1944
1945
1946
Notes
$112,000 [13]
$152,000 [14]
$150,000 [15] *26 $150,000 [16]
Accounts receivable
16,575
19,352
16,570
127,070
The accounts receivable were, as follows: 1943
1944
1945
1946
J. T. Griffin
$12,075
$12,070
$12,070
$12,070
J. T. Griffin Estate
1,079
J. T. Griffin Guardian for John Toole Griffin
4,500
4,500
4,500
Griffin Grocery Co.
75,000
Griffin-Goodner Grocery Co.
40,000
Koma
1,702 The assets do not include such accounts in 1947. The same accounts at the close of 1939 to 1942, inclusive, show that J. T. Griffin was indebted to the corporation for $25,000, $24,030, $22,000, and $12,075, respectively. In January 1948 Tulsa loaned the Griffin Grocery Co. the amount of $100,000 on open account, payable on demand. The loan was unpaid on about September 1, 1948. Tulsa has paid dividends during its existence, both being paid in 1935 or 1936. In 1946 and 1947 Tulsa spent $14,689.91 and $32,477.52, respectively, for improvements to its leasehold. In the latter year it spent $1,500 for *27 land and $14,729.98 for equipment for FM broadcasting. Koma's directors held at least six meetings in 1944, and Tulsa at least three in that year and one in 1945. The directors in attendance at each of the meetings were Bryan Cole, Bryan Mathes, and Marjory G. Leake, and, in addition, J. T. Griffin attended the meeting held by the directors of Koma on January 4, 1944. The absence of J. T. Griffin at other meetings was due to illness. His son was in active military duty from May 1943 to November 1945, and served overseas during an undisclosed portion of that period. Minutes were not written for all meetings held by the directors. During 1943 and 1944 no director owning full title to stock of petitioners participated in any decision to accumulate the profits of the corporation or distribute them as dividends. Meetings of the stockholders of Koma held on January 1, 1943 and January 4, 1944, were attended only by J. T. Griffin, Bryan Cole, and Bryan Mathes. The same individuals were the sole attendants at a meeting of the stockholders of Tulsa on November 2, 1943. J. T. Griffin did not enter the offices of Tulsa, in Tulsa, and Koma, in Oklahoma City, more than two times during the taxable *28 years, and those visits were not made to discuss or transact any business of the corporations. He did not, during the taxable years, discuss with Bryan Cole and Bryan Mathes the question of whether or not petitioners should declare a dividend. The failure of Koma to pay higher dividends on its common stock in 1943, and any dividends on its common in 1944 and preferred stock in 1943 and 1944, and the failure of Tulsa to pay any dividends in 1943 and 1944, resulted in savings of surtaxes by their stockholders. In his determination of the deficiencies the respondent held that petitioners permitted their surpluses to accumulate beyond reasonable business needs for the purpose of preventing the imposition of surtax upon their stockholders and, accordingly, included in their tax liability the surtax imposed by Section 102 of the Internal Revenue Code. During the taxable years the petitioners were availed of for the purpose of preventing the imposition of surtax upon their stockholders by permitting their earnings to accumulate beyond the reasonable needs of their business. Opinion Section 102 (a) imposes a surtax upon petitioners if they were "formed or availed of for the purpose of preventing *29 the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting earnings or profits to accumulate instead of being divided or distributed * * *." Section 102 (c) provides that the accumulation of earnings "beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." The petitioners contend, in general, that they accumulated profits during the taxable years for no reason other than to meet the reasonable needs of their business. The respondent adheres to the view taken by him when determining the deficiencies and asserts that petitioners have not shown that avoidance of surtax on their stockholders was not a motive for accumulating the earnings. He makes no contention that the petitioners were formed for the proscribed purpose. The common question is one of fact to be determined from all of the evidence, and petitioners had the burden of showing that profits were not accumulated beyond reasonable business needs. The Universal Steel Co., 5 T.C. 627; World Publishing Co., 169 Fed. (2d) 186. *30 The primary question in the issue is the purpose of the accumulations. Cecil B. DeMille, 31 B.T.A. 1161, 1174; aff'd, 90 Fed. (2d) 12. Petitioners rely primarily upon the need of funds for improving their AM facilities and to enter the field of broadcasting with FM and TV. Improvement of AM broadcasting facilities is stressed more by Koma than by Tulsa. We will consider separately the contentions of each petitioner. KOMA, Incorporated 1. AM broadcasting. Koma's contention for the need to accumulate funds for strengthening its position in standard broadcasting is based upon the acquisition of facilities for a 50 kilowatt station, which were installed in 1946 and 1947 at a total cost of about $217,000. Until that time it employed five kilowatts of power. As early as 1940 it applied to the FCC for permission to use a 50 kilowatt transmitter. Later, in December 1941, it amended its application to ask for a permit to operate with 10 kilowatts. While the application was pending, the FCC, in April 1942, issued a freeze order and with it went any hope of Koma to acquire additional equipment until some indeterminable time in the future. In February 1944, while the freeze order was still *31 in effect, the corporation again amended its application and received permission to use five kilowatts of power during the day and one-half kilowatt of power at night, a change that involved no new equipment and only small cost to put into effect. It was not until 1945 and after the termination of the war that Koma renewed its request and received permission to use 50 kilowatts. "The statute, we think, contemplates immediate need, need associated with business in hand * * *. " McCutchin Drilling Co. v. Commissioner, 143 Fed. (2d) 480; Trico Products Corp. v. McGowan, 67 Fed. Supp. 311; aff'd, 169 Fed. (2d) 343. Any plans Koma had to increase the power of its station to 50 kilowatts to avoid interference with other stations, or for other reasons, were abandoned in 1941. As late as February 1944 Koma amended its application to cover only five kilowatts daytime, and one-half kilowatt at night - a change necessitating practically no cost. It does not appear that at any time thereafter until November 1945 Koma decided to again seek permission to use 50 kilowatts of power. In short, it appears that, contrary to the present contention, Koma did not, during the taxable years, contemplate *32 expensive changes as to AM, therefore did not need to, and did not, accumulate surplus for such purpose. Moreover, from April 1942 until August 1945, a period embracing the taxable years, it was impossible to obtain material to employ such power, and no one knew when the restriction would be lifted by the FCC. World Publishing Co. v. United States, supra. Under the circumstances, assuming that Koma had plans during the taxable years to make the improvements that were made in 1946 and 1947, there were no reasonable grounds for concluding that they could be carried out at any ascertainable time in the future, or, in fact, if ever, inasmuch as consent of the FCC was essential and Koma could no more than guess in 1943 and 1944 what the conclusions of the FCC might be on an application not filed until October 1945. Throughout the taxable years, there existed no more, in the final analysis, than a mere possibility that at some indeterminable time in the future steps would be taken to solve the difficulties of Koma, resulting from interference with other stations, by increasing the power of its station to 50 kilowatts. It is alleged by Koma, as evidence of necessity for accumulation of earnings, *33 that to complete the AM project it was necessary to borrow $100,000 from the First National Bank of Dallas, and to sell the new standard broadcasting site and building. The evidence does not go so far. As to the loan, the evidence relied upon is no more than that the corporation owed the bank $100,000 at the close of 1947 and, with respect to the sale, the witness said that the corporation needed the money, without giving a reason. The preferred stock of Koma, amount $233,000, was retired in 1947, in connection with which the corporation was required to borrow $130,000 from a bank. Nothing in the record is opposed to the idea that the $100,000 constitutes part of that loan. The voluntary retirement of stock to place about $200,000 in the hands of the estate of J. T. Griffin, and retirement of the remainder with no explanation for the necessity therefor, is completely opposed to the contention that accumulated earnings were needed for business needs. We are not impressed with testimony that another reason for retiring the stock was to save the difference between the dividends payable on the stock and interest on the bank loan. No dividend had been paid on the stock since 1941 and the *34 accumulated dividends were not paid when the stock was retired. It is apparent that without the family control that existed, Koma would not have retired the stock on the terms it did, considering its consistent record of earnings and the security the stockholders had for payment of dividends. It was then in the midst of installing new facilities for AM broadcasting and had permission to operate an FM station with 50 kilowatts of power. Obviously, under the circumstances here, the use of surplus assets, acquired mostly from earnings, voluntarily to retire stock served no real business purpose. To the contrary, the transaction utilized funds which, according to petitioner, were necessary for present and future business expansion. Other evidence inconsistent with a policy to accumulate earnings for reasonable business needs is found in the loans made to corporations controlled by Koma's stockholders. These loans were made as early as 1939, first at 2 per centum interest and then reduced to 1 1/2 per centum in 1943 and to 1 1/4 per centum in 1945. Except for a period of about four months commencing in 1940, and a period of about two weeks in 1945, the Griffin Grocery Co., a corporation *35 controlled by J. T. Griffin, was at all times until June 1946 in debt to Koma for amounts ranging from $7,000 to $65,000 on original or renewal borrowings. The accumulations of surplus were, in round numbers, about $30,000 in 1943 and $47,000 in 1944. Yet, in those respective years, loans due from stockholders and/or companies controlled by them were $30,000 and $65,000. In other words, earnings were accumulated while loans or accounts due from stockholders or their companies approximated or exceeded the accumulated earnings, so that it is apparent that, had the earnings been distributed as dividends, the loans could, in general, have been liquidated, and amount equivalent to the earnings could have been back in petitioner's treasury for the allegedly necessary use. The fact that the loans were payable on demand is of little consequence in view of their history and the control capable of being exercised by the common stockholders, particularly by J. T. Griffin. The loans disclose a purpose to use Koma's earnings for business needs of stockholders and other corporations, rather than to accumulate its earnings for its own business needs. 2. FM and TV Facilities. Koma asserts that definite *36 plans were initiated as early as 1940 and 1941 to broadcast with FM and TV. Nothing having any semblance to definiteness occurred at that time other than estimates made by the chief engineer by guesswork on costs of necessary facilities. Television was in an experimental stage during the taxable years and little progress was made during the war. Commercial use of FM was possible in 1940, yet Koma did nothing tangible towards entering the field until July 1945, when it applied for a permit. It does not appear when the FCC first authorized commercial use of TV. No definite steps were taken by Koma to operate with television until July 1948. Petitioner points to no formal action by Koma during or prior to the taxable years to use FM and TV at the earliest time or at any time in the future. No formal action on the subject was taken by the board of directors until April 1945 in the case of FM and July 1948 in the case of TV. Petitioner's claim of earlier action is confined to generalized discussions by Cole and Mathes with the chief engineer and general manager of the corporation on possible use of other means of transmission if and when they became practicable. Cole and Mathes were not *37 only not beneficial stockholders but they did not constitute a majority of the board of directors; consequently, they were not in a position to formulate corporate policy on the subject. The controlling interest in the stock of Koma was held by J. T. Griffin until his death in September 1944. Until that time he was president and a director of the corporation. Other shares were held by members of his family. No claim is made that J. T. Griffin, the principal party in interest, or his family, ever considered the employment of FM or TV, or both, in the future, or authorized any officer or employee of the corporation to shape the affairs of the corporation to that end. It is apparent that no capital outlay and business risk, such as, according to the evidence here, is involved in broadcasting with AM and TV, would have been seriously entertained without his consent. Where, as here, a corporation seeks to justify accumulation of earnings as because of proposed business expenditures, logic requires that those controlling the finances of such corporation intend such expenditures. Yet, here the only showing is that Cole and Mathes entertained ideas about FM and TV. There is not only no proof *38 of corporate action on the subject, but none that such ideas were communicated to or considered by the controlling stockholders or directors. They might, indeed, have opposed the ideas of Cole and Mathes, who were employees and though on the board of directors, were only nominal stockholders. Indeed the petitioner, in arguing that there was no purpose to evade surtax, points out that J. T. Griffin was ill and not participating in these matters. Most particularly when no formal corporate action is shown as determining upon the proposed expenditures, logic requires that the project be proven to have been contemplated by those whose votes would be necessary. Here such showing is altogether absent. Assuming that Cole and Mathes considered FM and TV, there is no record before us that either the corporation or its controlling stockholders did so. The lack of formal record, on the alleged FM-TV project, in the taxable years, is especially significant when it is noted that in 1945 FM was the subject of minutes in a formal meeting in April 1945, and TV on June 12, 1948. Koma did not apply for permission to operate FM with 50 kilowatts of power until July 1945 and a final permit was not granted *39 until a year later. Delivery of a transmitter necessary for the operation was not obtained prior to January 1, 1949. The estimated cost of the installation was $112,060, of which amount a total of $18,661.97 was spent in 1946 and 1947. Its surplus at the close of 1942 was in excess of the estimated cost, and earnings each year thereafter to the close of 1947 increased the surplus by $227,630. Furthermore, current assets in excess of current liabilities were about $131,000 at the close of 1943 and about $170,000 at the close of 1944. No application was filed by Koma for permission to operate with television until July 1948, which was almost three years after the freeze order of the FCC was vacated, and at the time of the hearing herein the FCC had taken no action on the request. The evidence contains nothing to establish when the FCC is expected to pass upon the application, and, if approved, the conditions thereof. Thus, as late as 1948, there was no definite assurance that the corporation would be able to go on the air with television at any time in the future. As evidence that an excessive amount of earnings was not accumulated during the taxable years, Koma says that FM and TV facilities *40 would cost a total of $450,000, and that $235,753.57 was spent in 1946 and 1947 for standard broadcasting equipment, an aggregate amount considerably in excess of the surplus of about $210,000 at the close of 1944. The estimate made by the corporation's chief engineer in 1940 was from $160,000 to $200,000 for FM and $250,000 for TV. The estimate for FM was on the basis of a 50 kilowatt transmitter. He admitted that his estimate on FM was only a "guess" and as to the television estimate, that "we didn't have too much to go on then." In the taxable years the manager of the station estimated the cost of FM and TV at from $300,000 to $400,000 or more, without explaining how he arrived at his estimate. It is apparent that the estimates, under the circumstances prevailing here, are not greatly helpful, particularly in view of the fact that in 1940 only experimental operation of television was possible and petitioner did not know at that time, or in the taxable years, when it would be able to get permits, and if so, their conditions for FM and TV operation. In addition it is alleged that operating losses of $80,000 for from three to five years would be sustained in the operation of FM and *41 TV stations. Testimony to that effect is in the record respecting the operation of such stations by Tulsa; nothing concerning Koma. Opposed to Koma's contention that the accumulations were necessary for the proposed business expansion, are the facts with reference to the retirement of its preferred stock; for, in 1947, about four or five years after the alleged plans of FM and TV, and about two years after application had been made for FM, and when TV was obviously more imminent, and therefore on Koma's theory, the moneys more immediately necessary, Koma voluntarily retired all of its preferred stock. It expended $223,000 in so doing. Since such stock retirement was not required, it appears obvious that Koma preferred to expend its money in that way, rather than keep itself ready for FM and TV. This indicates strongly that even much later than the discussions as to expansion of broadcasting facilities, Koma did not regard itself in serious need of immediate funds for such purposes. It spent its working capital otherwise. We conclude and hold that the petitioner Koma accumulated its earnings and profits during the taxable years, beyond the reasonable needs of its business. 3. Avoidance *42 of Surtaxes. The surtax imposed by section 102 may not be imposed unless the purpose for not distributing earnings not required for reasonable business needs was to avoid the imposition of surtaxes on stockholders. Cecil B. DeMille, supra; General Smelting Co., 4 T.C. 313. The accumulation of earnings beyond reasonable business need is under the statute determinative of a purpose to avoid surtax upon stockholders in the absence of proof to the contrary by a clear preponderance of the evidence. The gist of the contentions of Koma is that the earnings were accumulated for no reason other than for reasonable business needs. Officers of Koma testified to that effect. Our duty here is to look beyond such testimony and to consider all of the evidence. Helvering v. Chicago Stock Yards Co., 318 U.S. 693; Trico Products Corporation, supra; World Publishing Co., supra. Since its organization in 1938 Koma paid dividends totaling $43,068 on its preferred stock in 1939, 1940, and 1941, and a total of $13,500 on its common stock in 1941, 1942, and 1943. No dividends were paid by it thereafter through 1947. During each of those years it had earnings, sufficient to create a surplus of $130,270, *43 at the beginning of 1943 and $357,800 at the close of 1947. During most of that period loans were made at low interest to corporations controlled by Koma's stockholders, and no proof was made that any of the interest was paid. The loans, particularly in view of the dividend record of the corporation, are indicative of a purpose to avoid surtaxes. Helvering v. National Grocery Co., 304 U.S. 282. If the loans to stockholders were sound and collectible so as to be available for the alleged purpose the stockholders would have been able to contribute readily for such purpose - so that escape from taxation of dividends appears as the real reason for leaving loans or credits to stockholders outstanding and at the same time accumulating earnings. In Whitney Chain & Mfg. Co., 3 T.C. 1109; aff'd., 149 Fed. (2d) 936, we held that the petitioner was availed of to prevent imposition of surtax on shareholders, where loans were outstanding to stockholders at the time when it was claimed that earnings were needed to finance proposed expansion. On this subject, in United Business Corporation of America v. Commissioner, 62 Fed. (2d) 754, loans to a sole stockholder were referred to as follows: "* *44 * * These loans are incompatible with a purpose to strengthen the financial position of the petitioner, but entirely accord with a desire to get the equivalent of his dividends under another guise. * * *" We think the situation here is not essentially different. That the failure to distribute more of the earnings during the taxable years enabled stockholders to save surtaxes is shown by our findings. It is not essential that proof be made that all of the stockholders avoided surtaxes. Trico Products Corp., 46 B.T.A. 346, 382; aff'd., 137 Fed. (2d) 424. It is alleged by Koma that Mathes and Cole were solely responsible for the decisions not to declare dividends during the taxable years. The inference sought is that stockholders whose surtaxes would have been increased by distributions of earnings did not participate in the formulation of the corporation's dividend policy. Koma did pay dividends in the amount of $3,000 on its common stock in 1943, which discloses that the subject was discussed and formally acted upon by the directors at some undisclosed time. No minutes of the meeting or other minutes respecting dividends were submitted in evidence by petitioner. The directors held *45 at least six meetings in 1944, the first of which was attended by J. T. Griffin, and, therefore, ample opportunities existed to consider the question. Cole and Mathes, being no more than holders of qualifying shares, could not have derived any financial benefit from payments of dividends, and, consequently, were in no position to press the question one way or another. The failure of Griffin and his daughter, the other directors, to bring the question before the directors for formal action on occasions other than the one for the dividend payment made in 1943, indicates that they did not wish to have a greater distribution of earnings. Obviously, they possessed the power to cause distributions of earnings. Their failure to act to that end indicates a desire to accumulate earnings to avoid surtaxes. Certainly they were aware of the corporation's record of dividend payments, for if any had been paid they would have received them. The purpose of Cole and Mathes does not demonstrate the purpose of the controlling stockholders, none of whom testified. Considering that the fact, as we have concluded, that the accumulations were beyond reasonable business needs, determines that there was purpose *46 to avoid surtax unless the contrary is proven by clear preponderance of evidence, and considering all of the evidence on the question, we conclude that Koma has not shown by requisite proof that the earnings during the taxable years in excess of the reasonable needs of its business, excluding the dividend paid in 1943, was not for the purpose of avoiding surtax on its stockholders. Tulsa Broadcasting Co. The contentions of Tulsa follow much the same pattern as the argument advanced by Koma. They are, in effect, that in 1941 the board of directors decided to retain working capital to improve the corporation's AM position and to expand its facilities to include FM and TV, paying no dividends in the meantime, and that the stockholder-directors never participated in a conclusion to accumulate earnings instead of distributing them as dividends. 1. AM Facilities. While Tulsa argues, in general, that it was necessary to accumulate earnings to meet the cost of improving its service to the public through standard broadcasting, it concedes that the proof here is that there was no method known to it by which to improve such operation, and that the situation in that regard was the basis for its *47 application for permission to broadcast with FM. The standard broadcasting facilities were not changed in any respect after 1940, and, aside from an unfounded hope that at some time in the future some way could be found to improve its service to the public, it does not appear that Tulsa had any basis for accumulating earnings to meet the cost of changes in its operations with AM. A desire to improve somehow its local position in broadcasting to the public can not justify an accumulation of earnings to await a time in the indeterminable future when an unpredictable event might occur to enable the corporation to solve the problem. 2. FM and TV Facilities. There is no proof here that the board of directors at any time prior to or during the taxable years, formally or otherwise, decided to broadcast with FM or TV at any time in the future. Discussions on the subject among Mathes and Cole and the chief engineer and the general manager were necessarily of a generalized nature. The former were directors but not equitable stockholders and, for the same reasons set forth as to Koma, obviously were never in a position to bind the corporation on a project as important as entering the field of *48 FM and TV. The controlling interest in the stock of Tulsa was owned by J. T. Griffin and the remainder by members of his family and a brother. It does not appear that J. T. Griffin ever participated in any of the discussions relating to the question. Thus, whatever ideas Mathes and Cole might have had about eventually using FM and TV in the business were formed without binding effect on the corporation, and are not shown to have been communicated to or held by the controlling stockholders. At that time equipment was not available and it was impossible to determine when it would be. The conditions then prevailing prevented the corporation from making any definite arrangements for FM and TV. The cost of FM and TV could not be estimated during or prior to the taxable years with any substantial degree of accuracy. That is shown by the fact that no prices were established for much of the necessary equipment and that estimates made by the chief engineer ranged from $250,000 to $500,000. An estimate of such a range is little, if any, better than a guess. Estimates filed with the applications for permits from the FCC showed about $106,000 as the probable cost of FM and about $220,000 as the *49 cost of TV. A permit for operating FM with 170 kilowatts was not granted until 1946 and about $15,000 was spent in 1947 for equipment to operate temporarily with one kilowatt of power, and we are without evidence on when one will be approved, and, if approved, whether it will be used. That Tulsa may never take full advantage of the authority granted by the FCC is shown by a letter its general manager and one of its vice presidents wrote, on April 21, 1948, to Tulsa's counsel, in which he said, in respect to broadcasting by FM: "* * * I would like to stay away from asking for any modifications because it seems to me we will eventually want to do one of two things. Either we will want to fulfill the maximum grant which the Commission has given us, or we'll want to drop FM completely. * * * "I think we are in a position to sit back and wait for the Commission to push us from this point on. If they push us out, they will be pushing out the only decent FM operation in Tulsa." Such expression of attitude on the full use of FM in its business casts doubt on whether it will ever take advantage of the permit granted to broadcast with high frequency, and indicates that Tulsa never seriously *50 planned for FM operation beyond placing itself in a position perhaps to do so "eventually" at some future time. The above quoted statement makes less persuasive testimony of witnesses on intent during the taxable years to expand the business to include FM facilities. Permission to use TV was applied for in 1948 and the application is still pending. The excess of the current assets of Tulsa over its current liabilities at the close of 1943 was about $212,000 and, at the close of 1944, about $250,000. The amount increased each year thereafter and was about $332,000 at the close of 1947. Its surplus increased from about $130,000 at the close of 1942 to about $378,000 at the close of 1947. It is evident that Tulsa's net current assets and surplus during the taxable years were ample to provide for business needs in the reasonably immediate future with respect to FM and TV, particularly in view of reasonable prospects it had for earnings in the future. As in the case of Koma, we find that Tulsa made loans at low interest rates to its majority stockholder and to corporations controlled by its stockholders, commencing as early as 1939. The consistency and size of such loans are shown in detail *51 in our findings. In addition, J. T. Griffin, the dominating stockholder, or his estate after his death in September 1944, was indebted to the corporation under accounts receivable at the close of 1939 to 1946, inclusive, in amounts ranging from $12,070 to $25,000. It does not appear whether interest was paid on the loans or whether interest was charged or paid on the open accounts. One of the loans, amount $100,000, was made in 1948 after permission had been received to broadcast with FM and five months before an application was filed to employ TV in its business. The loans and accounts are of particular significance in view of the failure of Tulsa to pay any dividends after 1935 or 1936. They disclose, under the circumstances, a consistent policy to finance needs of stockholders and corporations they controlled, and are contrary to the declared purpose of accumulating earnings for future business needs, especially when viewed in the light of similar loans made by Koma. The need of the corporations and J. T. Griffin for funds could have been accomplished at least in part by the payment of dividends and, in the case of the corporations, loans by the stockholders to them. Assets were *52 available for payment of dividends in an amount far in excess of earnings during the taxable years. 3. Avoidance of Surtaxes. Has Tulsa shown by a clear preponderance of the evidence that the accumulations of earnings beyond the reasonable needs of its business were not for the purpose of avoiding surtaxes on its stockholders? We think that it has not. The facts are in many respects like those prevailing in the case of Koma. Tulsa never paid dividends, except two of undisclosed amounts in 1935 or 1936, in spite of earnings each year after 1938 sufficient to increase its surplus from about $103,000 at the close of 1939 to about $378,000 at the close of 1947. In 1940 and thereafter through 1946 it made large loans to J. T. Griffin, its controlling stockholder, and corporations controlled by its stockholders at low rates of interest. The loans to the Griffin Grocery Co., controlled by J. T. Griffin, were, except for short intervals, outstanding at all times from 1940 to 1947, and the loan to J. T. Griffin, in the amount of $100,000 at 1 1/2 per centum interest, although payable on demand like the other loans, was unpaid for over three years, terminating May 1, 1947. In addition, J. T. *53 Griffin owed the corporation large sums from 1939 to 1946, inclusive, under accounts receivable and two of the controlled corporations were indebted to it under like accounts at the close of 1946 for a total of $115,000. The record contains no explanation of the purpose of the loans or the circumstances surrounding the other charges. It is apparent that any financial needs of J. T. Griffin, and the corporations he and other shareholders of Tulsa controlled, could have been satisfied to a great extent with dividends paid by Tulsa out of its large surplus. What we have above said as to loans by Koma applies equally here. The fact that the loans were payable on demand is not of great significance under the circumstances prevailing here. In any event, no proof was made that the individuals and corporations could have paid on demand. No evidence of security appears. The loans were made frequently enough to infer a policy to use surplus funds for financing needs other than business requirements of Tulsa. Obviously, J. T. Griffin was aware of the large loan made to him in 1944 and nothing is contrary to the view that he was aware of the large loans made to the corporations, and, during his *54 lifetime, directed that they be made. As president, a director, and the majority stockholder, he was in a position to dominate the corporation's financial policies, and was aware of the fact that it had not paid a dividend since 1935 or 1936, in spite of large earnings. Not having received a dividend during that time, he knew the corporation's policy in regard thereto. The evidence here shows that, due to illness, he was not actively engaged in the affairs of Tulsa during the taxable years but he did attend a meeting of the stockholders on November 2, 1943. Nothing in the evidence is contrary to the idea that he was a regular attendant at called meetings of the directors prior to his illness. Under the circumstances, it would be unreasonable to conclude that J. T. Griffin did not participate in the corporation's policy with respect to the distribution of its earnings and the use of its surplus funds. Considering all of the evidence, we find that Tulsa has failed to prove that its earnings during the taxable years in excess of reasonable business needs were not accumulated for the purpose of avoiding surtax on its shareholders. Decisions will be entered under Rule 50. Footnotes
1. President-Director of each corporation until his death in September 1944. ↩
2. Includes qualifying shares in name of Bryan Mathes and Bryan Cole. ↩
3. After death of J. T. Griffin in September 1944, 204 shares in 1947 and 1948. ↩
4. Son of J. T. Griffin and president after father's death. ↩
5. 97 shares in 1945 and 1946, and 122 shares in 1947 and 1948. ↩
6. Daughter of J. T. Griffin and director of each corporation. ↩
7. 86 shares in 1945 and 1946, and 95 shares in 1947 and 1948. ↩
8. To close of 1944. 9. Qualifying shares. Vice-president and director of each corporation since organization. ↩
10. Qualifying shares. Was secretary-treasurer of each corporation since its organization, and a member of board of directors of Koma since its organization and of Tulsa since the latter part of 1944. ↩
11. Brother of J. T. Griffin. ↩
12. In 1947 and 1948.↩
13. Demand loans totaling $87,000 made to the Griffin Grocery Co. in 1940 and 1942 at 2 per cent interest and a like loan made in 1943 for $25,000 at 1 1/2 per cent interest. The loans were paid on April 11, 1944. ↩
14. Consists of demand loan made to Griffin Grocery Co. on July 26, 1944, in the amount of $52,000, and a like loan made by John T. Griffin on April 11, 1944, for $100,000, each at 1 1/2 per cent interest. The note for $52,000 was paid on June 26, 1945. ↩
15. Demand loan made to Griffin Grocery Co. on July 12, 1945, amount $50,000 at 1 1/4 per cent interest and loan made by John T. Griffin on April 11, 1944. The note for $50,000 was paid on June 20, 1946. 16. Represents $50,000 loan made to Griffin Grocery Co. in 1946 on demand note at 1 1/4 per cent interest and loan made by John T. Griffin on April 11, 1944. Each of the notes was paid in 1947.↩